1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DAVID A. ELLIOTT,                          No.  2:11-cv-03118 KJM DAD P

12               Plaintiff,

13        v.                                    FINDINGS AND RECOMMENDATIONS

14   STEPHEN TSENG,

15               Defendant.

16

17        Plaintiff is a state prisoner, currently incarcerated at Avenal State Prison.  Plaintiff

18   proceeds pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. §

19   1983, on his Eighth Amendment claims in which he alleges that defendant Dr. Stephen Tseng was

20   deliberately indifferent to plaintiff's serious medical needs.  Pending before the court is a motion

21   for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure, on

22   behalf of sole defendant, Dr. Tseng.  Plaintiff filed an opposition to the motion, and defendant

23   filed a reply.  For the reasons set forth below, the undersigned recommends that defendant

24   Tseng's motion for summary judgment be granted.

25                                    **BACKGROUND**

26        This action proceeds on plaintiff's original complaint, filed November 22, 2011.  (ECF

27   No. 1.)  Therein, plaintiff alleges that, shortly after his transfer from Pleasant Valley State Prison

28   to Mule Creek State Prison, defendant Dr. Tseng abruptly terminated plaintiff's prescription for

                                          1

1   the pain medication Tramadol and failed to provide plaintiff with an effective pain management

2   alternative, causing plaintiff to suffer withdrawal side effects and increased pain.  Plaintiff seeks

3   compensatory and punitive damages, and injunctive relief in the form of "proper medical

4   treatment [] and pain management."  (Id. at 9.)

5        Defendant Tseng filed the pending motion for summary judgment on October 7, 2013.

6   (ECF No. 29; see also ECF No. 30.)  After obtaining an extension of time to do so, plaintiff

7   timely filed his opposition on November 15, 2013.  (ECF Nos. 34; see also ECF Nos. 33, 35.)  On

8   November 2, 2013, defendant filed his reply (ECF No. 38), as well as his objections and response

9   to plaintiff's additional filings (ECF Nos. 39-40).

10                **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

11        Summary judgment is appropriate when the moving party "shows that there is no genuine

12   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

13   Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

14   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

15   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

16   The moving party may accomplish this by "citing to particular parts of materials in the record,

17   including depositions, documents, electronically store information, affidavits or declarations,

18   stipulations (including those made for purposes of the motion only), admission, interrogatory

19   answers, or other materials" or by showing that such materials "do not establish the absence or

20   presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

21   support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden

22   of proof at trial, "the moving party need only prove that there is an absence of evidence to support

23   the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).

24   See also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

25   adequate time for discovery and upon motion, against a party who fails to make a showing

26   sufficient to establish the existence of an element essential to that party's case, and on which that

27   party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure

28   of proof concerning an essential element of the nonmoving party's case necessarily renders all

2

1   other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so

2   long as whatever is before the district court demonstrates that the standard for entry of summary

3   judgment, . . ., is satisfied." Id. at 323.

4        If the moving party meets its initial responsibility, the burden then shifts to the opposing

5   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

6   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

7   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

8   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

9   admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

10  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

11  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

12  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

13  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

14  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

15  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

16       In the endeavor to establish the existence of a factual dispute, the opposing party need not

17  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

18  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

19  trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

20  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

21  Matsushita, 475 U.S. at 587 (citations omitted).

22       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

23  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

24  party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

25  the opposing party's obligation to produce a factual predicate from which the inference may be

26  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

27  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

28  party "must do more than simply show that there is some metaphysical doubt as to the material

1  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

2  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

3  omitted).

4  **OTHER APPLICABLE LEGAL STANDARDS**

5  **I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983**

6  The Civil Rights Act under which this action was filed provides as follows:

7  Every person who, under color of [state law] . . . subjects, or causes
   to be subjected, any citizen of the United States . . . to the
8  deprivation of any rights, privileges, or immunities secured by the
   Constitution . . . shall be liable to the party injured in an action at
9  law, suit in equity, or other proper proceeding for redress.

10  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

11  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

12  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

13  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

14  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

15  omits to perform an act which he is legally required to do that causes the deprivation of which

16  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

17  Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

18  their employees under a theory of respondeat superior and, therefore, when a named defendant

19  holds a supervisorial position, the causal link between him and the claimed constitutional

20  violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);

21  Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations

22  concerning the involvement of official personnel in civil rights violations are not sufficient.  See

23  Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

24  **II.  Deliberate Indifference to Serious Medical Needs under the Eighth Amendment**

25  The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment

26  prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v.

27  Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  In order to

28  prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that

4

1  objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

2  acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

3  Seiter, 501 U.S. 294, 298-99 (1991).

4       If a prisoner's Eighth Amendment claim arises in the medical care context, the prisoner

5  must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference

6  to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has

7  two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's

8  response to that need."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on

9  other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

10       A medical need is serious "if the failure to treat the prisoner's condition could result in

11  further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974

12  F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include

13  "the presence of a medical condition that significantly affects an individual's daily activities."  Id.

14  at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the

15  objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S.

16  825, 834 (1994).

17       If a prisoner establishes the existence of a serious medical need, he must then show that

18  prison officials responded to the serious medical need with deliberate indifference.  See Farmer,

19  511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny,

20  delay, or intentionally interfere with medical treatment, or may be shown by the way in which

21  prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

22  Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard to

23  medical care, however, "the indifference to his medical needs must be substantial.  Mere

24  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

25  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

26  105-06).  See also Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in

27  diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth

28  Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of

5

1   mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for

2   the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835.

3       Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S.

4   at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care,

5   however, a plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732,

6   745-46 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974

7   F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990).  In this regard, "[a]

8   prisoner need not show his harm was substantial; however, such would provide additional support

9   for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett v. Penner,

10  439 F.3d 1091, 1096 (9th Cir. 2006).

11      Finally, mere differences of opinion between a prisoner and prison medical staff or

12  between medical professionals as to the proper course of treatment for a medical condition do not

13  give rise to a § 1983 claim.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012); Toguchi,

14  391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891

15  F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

**ANALYSIS**

16

17      Defendant Tseng moves for summary judgment on the grounds that the evidence before

18  the court establishes:  "(1) there was no objectively excessive risk to plaintiff's health or safety;

19  (2) Dr. Tseng was neither subjectively aware of any risk to plaintiff, nor did he intentionally deny,

20  delay, or interfere with plaintiff's treatment; and (3) plaintiff identifies no injury directly caused

21  by Dr. Tseng."  (Motion (ECF No. 29 at 1).  Alternatively, defendant Tseng asserts that he is

22  entitled to qualified immunity.

23  **I.  Defendants' Evidence and Arguments**

24      Defense counsel argues that the evidence submitted on summary judgment establishes that

25  defendant Dr. Tseng was not deliberately indifferent to plaintiff's serious medical needs but

26  instead provided plaintiff with medically acceptable care.  (Def.'s Mem. of Ps & As in Supp. of

27  MSJ (ECF No. 29-1) at 14-23.)  In support of defendant's motion counsel has submitted a

28  statement of undisputed facts supported by declarations signed under penalty of perjury by

1   defendant Dr. Tseng, and Dr. B. Barnett, the Chief Medical Officer for the California

2   Correctional Health Care Services, Receiver's Office of Legal Affairs.[1]  (Def.'s Statement of

3   Undisputed Facts (DUF) (ECF No. 29-2).)  Defendant's statement of undisputed facts is also

4   supported by citations to plaintiff's complaint and to the transcript of plaintiff's deposition.

5           The evidence submitted by defendant establishes the following.  Plaintiff, who suffers

6   from Hepatitis C, is a patient in California Department of Corrections and Rehabilitation's

7   (CDCR) Chronic Care Program (CCP) California Correctional Health Care Services Division.[2]

8   Dr. Tseng first treated plaintiff on January 19, 2011, after plaintiff's transfer to Mule Creek State

9   Prison (MCSP).  (DUF 63.)  At that time, and during the preceding three years, plaintiff was

10  prescribed and was taking Tramadol for pain management.  (DUF 34, 60.)  Tramadol is an opiate

11  "agonist," meaning that it performs at the same site in the cells as an opiate.  In effect, Tramadol

12  is considered an opiate because it has many of the same effects as morphine, including addictive

13  properties.  Tramadol is used to treat moderate to moderately severe pain in adults.  (DUF 11, 12.)

14          In 2009, the State of California Prison Health Care Services Division published its Pain

15  Management Guidelines (Guidelines), in order to standardize the evaluation and treatment of pain

16  within the California Prison Health Care Services system.  At that time a severe risk of tolerance,

17  

18  [1]  Although not explicitly designated defendant's expert witness, Dr. Barnett's training and
    experience, his detailed review of plaintiff's medical record, and his professional medical opinion

19  based thereon, render him an expert witness within the meaning of Rule 702, Federal Rules of
    Evidence.  While Dr. Barnett's professional responsibilities include oversight of CDCR's medical

20  services, such as those provided by defendant, Dr. Barnett has been accorded expert witness
    status in numerous civil rights actions filed by prisoners in this court.  See e.g. Tenore v.

21  Goodgame, Case No. 2:11-cv-01082 WBS CKD P, 2014 WL 496697, *7 (E.D. Cal. Feb. 6,
    2014); Moreno v. Medina, Case No. 2:08-cv-01344-JAM-EFB P, 2013 WL 3730397, *5 (E.D.

22  Cal. July 12, 2013); Carroll v. Yates, Case No. 1:10-cv-00623 LJO SKO P, 2013 WL 100237,*3

23  (E.D. Cal. Jan. 7, 2013).  Accordingly, the undersigned has treated Dr. Barnett's professional
    opinions to be those of an expert medical witness.

24  

25  [2]  The purpose of the Chronic Care Program, within the California Correctional Health Care
    Services Division (CCHCD), is to ensure that patient-inmates with chronic health conditions are

26  screened, identified and treated; receive appropriate follow up and continuity of care; are
    provided with approved treatment guidelines for the treatment of specific chronic disease; and

27  receive health care education, counseling, and targeted goal-setting for practicing healthy
    behaviors, managing their own chronic illness, and improving their health outcomes and quality

28  of life.  CCHCD Inmate Medical Services Policies & Procedures, Vol. 7, Ch. 1A.

1  dependence, and addiction to Tramadol was noted in the Guidelines.  (DUF 14.)  The Guidelines

2  therefore recommended that tramadol be prescribed only for a short time, generally not longer

3  than ten days, and only if severe pain with objective evidence of injury exists.  (DUF 15.)  The

4  Guidelines also instructed medical providers to consider opioids only if patients are unresponsive

5  to non-opioid analgesics and non-narcotic "adjuvant" medications, and only in the presence of

6  "objective evidence of severe disease" as demonstrated by imaging tests, EMG, lab studies and/or

7  direct examination.  (DUF 19.)  It is also recognized that the risk of addiction to opioids in

8  patients with a history of substance abuse is higher than it is in patients without such a history,

9  and a history of substance abuse is therefore a factor to be considered in the decision to prescribe

10  opioids or opioid agonists.  (DUF 20.)  Finally, it has been found that chronic opiate use may

11  cause adverse side effects, including endocrine dysfunction, immunosuppression and infectious

12  disease, opioid-induced hyperalgesia and xerostomia, overdose, falls and fractures, and

13  psychosocial complications.  (DUF 17.)

14        Plaintiff was first prescribed Tramadol in March 2008, while he was incarcerated at

15  Pleasant Valley State Prison (PVSP), after suffering a frontal sinus fracture and blunt facial

16  trauma.  An initial CT scan showed a comminuted, depressed fracture of plaintiff's frontal sinus.

17  (DUF 32-4, 37-8.)  Plaintiff's medical record indicates that he was also prescribed Neurontin[3] as

18  early as July 2009.  (Barnett Decl., Ex. B (ECF No. 29-3 at 34).)   In April 2008, a PVSP staff

19  psychologist, Dr. Tania Gonzalez, Ph.D., diagnosed plaintiff as suffering with general anxiety,

20  depression, and amphetamine abuse, with a notation to "R/O ASPD" (rule out antisocial

21  personality disorder).  (Apr. 10, 2008 CDCR Mental Health Treatment Form; Barnett Decl., Ex.

22  B (ECF No. 29-3 at 25).)   The psychologist described a "H/O [history of] marijuana, meth (1x –

23  /////

24  /////

25  /////

26  /////

27

28  _____

[3]  Neurontin, also known as Gabapentin, is an anticonvulsant and analgesic drug used to relieve neuropathic pain.

8

1    2x/mth for many yrs) – longest binge was weekend." (Id. at 23.) (DUF 40.)[4]

2          Plaintiff complained of back pain while housed at PVSP.  The evidence presented on

3    summary judgment establishes the objective findings with respect to that condition were as

4    follows.  An August 2008 EMG and nerve conduction study showed no lumbar radiculopathy or

5    peripheral neuropathy.  Although the results showed a "severely reduced" amplitude in a muscle

6    on the top of plaintiff's right foot, the readings were normal for plaintiff's left foot and both of his

7    legs.  (DUF 41-3.)  An October 2008 MRI showed degenerative disc disease at L4-L5, but no disc

8    herniation, with patent neural foramina and normal cord.  (DUF 44.)  October 2008 x-rays of

9    plaintiff's right hip and facial bones were negative.[5]  (DUF 45-6.)  In December 2008, an

10   examining physician found that plaintiff's thoracic spine was normal, and that the previously-

11   noted objective findings were remarkable only for mild degenerative changes at L4-L5 without

12   evidence of nerve entrapment.  (DUF 47.)

13         In December 2008, plaintiff was referred to a physical therapist to treat his "greater

14   trochanteritis" (inflammation of the trochanteric bursa in plaintiff's hip).  (Dec. 17, 2008 PT

15   Consultation; Barnett Decl., Ex. B (ECF No. 29-3 at 30)).)  Plaintiff complained that he twisted his

16   hip in the March 2008 incident, that his hip occasionally popped and that he had low back pain.

17

18   [4]  Defendant has submitted evidence that at the time of plaintiff's sentencing in January of 2006
     there was information before the court indicating that plaintiff began drinking alcohol and
19   smoking marijuana as a teenager, drank daily in the late 1980s and early 1990s, used marijuana
     weekly from the 1990's until the time of his sentencing and had begun using methamphetamine in
20   the 1990's and used it on and off until 1995, including ingesting the drug intravenously at times.
     (DUF, Ex. I (ECF No. 29-2) at 23.)
21

22   [5]  Although plaintiff admits this fact on summary judgment, the court notes that the x-rays of
     plaintiff's face taken in October of 2008 were not unequivocal.  Rather, the x-ray report provided
23   in pertinent part:

24              Facial bones:  Water's Caldwell and both lateral views of the facial
                bones are inadequate for proper evaluation of trauma.  No acute
25              bony injury is seen on this limited study.  Visualized paranasal
                sinuses are clear.  No free air is seen in the orbits.
26
                Impression: Limited examination of the facial bones showing no
27              abnormalities.

28   (Barnett Decl., Ex. B (ECF No. 29-3 at 28).)

1   The physical therapist opined in part that plaintiff had poor posture, and prescribed four weeks of

2   physical therapy, once a week.  However, plaintiff declined to attend the subsequently scheduled

3   physical therapy sessions on March 16, 23, 30, and August 29, 2009.  Accordingly, on August 29,

4   2009, the sessions were terminated due to plaintiff's refusal to attend.  (Id. at 31-34; DUF 51-5.)

5        In May 2010, plaintiff refused to take his prescribed Tramadol in crushed form, claiming

6   that the manufacturer warned not to crush the medication.  (DUF 56.)  Plaintiff also avers that

7   receiving the medication in crushed form caused him headaches.  (Pl.'s Oppo. to Def.'s

8   Undisputed Facts (ECF No. 34) (Pl.'s Oppo. to DUF 57.)  However, as defendant notes, the

9   evidence before the court establishes that prison medical staff are instructed to administer the

10  regular (as compared to the extended release) form of Tramadol, which was prescribed to plaintiff

11  in crushed form.[6]  (DUF 57.)

12       In December 2010, PVSP Physician Assistant (PA) R. Wilson conducted a CCP follow-up

13  visit with plaintiff.  PA Wilson observed that plaintiff's gait, movements, and "well-developed

14  muscular tone" were inconsistent with his complaints of pain and limited range of motion.

15  (Barnett Decl., Ex. B (ECF No. 29-3 at 36-7).)  PA Wilson noted in pertinent part:

16           Pt has no physical findings to support needing TID Neurontin.
             Reports of pain not consistent with P. exam.  Pt advised Neurontin
17           will be tapered.  I also question the need for Max dose Tramadol.
             Pt threatens lawsuit & 602 [stating that] "I'll be advising my
18           attorney of this."

19  (Id. at 36.)  (DUF 58.)  PA Wilson renewed plaintiff's prescription for Tramadol (50 mg, two

20  tablets three times a day) for a period of two months, and tapered plaintiff's Neurontin as follows:

21  600 mg three times a day for two weeks, then 300 mg three times a day for two weeks, with no

22  renewal.  Medical staff was directed to "DOT [Directly Observed Therapy] crush" for both

23  medications.  (Barnett Decl., Ex. B (ECF No. 29-3 at 38).)

24       On January 5, 2011, plaintiff was transferred from PVSP to MCSP.  (DUF 59.)  At intake,

25  pursuant to the new arrival medication reconciliation procedures, Dr. R. Rudas noted that plaintiff

26  _____

27  [6] The Pain Management Guidelines specifically require that Tramadol "[m]ust be crushed/
    floated."  Guidelines at 67 ("Pain Management Formulary").  Defendant also cites Medline Plus,
    a service of the U.S. National Library of Medicine and National Institute of Health, which warns
28  patients not to crush only extended release tablets.   (DUF 57.)

1   was allergic to Tylenol, and had been taking Neurontin and Tramadol.  Plaintiff's Tramadol

2   prescription was extended at that time.  (DUF 60.)  Plaintiff states that he no longer received

3   Neurontin after his transfer to MCSP.  (Pl.'s Oppo. to DUF 60.)  The day after his arrival at

4   MCSP, January 6, 2011, plaintiff submitted a Health Care Services (HCS) Request Form[7] in

5   which he requested to see a physician to address severe pain in his hip, shoulder, and right leg.

6   Plaintiff stated that he had received treatment at PVSP for these conditions since 2008.  The next

7   day, medical staff scheduled a physician's appointment for plaintiff.  (DUF 61-2.)

8            On January 19, 2011, defendant Dr. Tseng met and examined plaintiff for the first time,

9   noting that plaintiff appeared "gaunt [and] fatigued [but] well developed in NAD [no apparent

10  distress]."  (Barnett Decl., Ex. B (ECF No. 29-3 at 40).)  At that time plaintiff described his

11  chronic pain symptoms and requested renewals of his prescriptions for Tramadol and Neurontin.

12  Dr. Tseng reviewed plaintiff's medical records and objective findings, and conducted a physical

13  examination including range of motion maneuvers and assessment of plaintiff's strength.  Dr.

14  Tseng noted no pathology in plaintiff's left shoulder and normal musculature but did note,

15  however, that plaintiff grimaced during the exam and would not cooperate.  Plaintiff stated that he

16  experienced pain with all attempted movements, including movements that Dr. Tseng otherwise

17  observed plaintiff to perform easily.  For example, Dr. Tseng observed that when plaintiff took

18  off his shirt, with his left arm overhead, he had normal range of motion and displayed no apparent

19  distress.  However, plaintiff grimaced when Dr. Tseng examined his back.  When distracted,

20  plaintiff exhibited normal motor strength and normal sensations through both knees and ankles.

21  Similarly, however, plaintiff grimaced when Dr. Tseng examined his right hip, although Dr.

22  Tseng did not discover any objective signs of pathology.  (DUF 63-4; 69-75.)  Dr. Tseng

23  accorded plaintiff a 4/5 Waddell score, indicating that it was more likely than not that plaintiff

24  was making up or grossly exaggerating his symptoms.  (DUF 95-6.)

25  /////

26  _____

27  [7]  The court notes that the two forms submitted by plaintiff in February 2011 contain no notation
     or indication that they were ever submitted or processed.  (See ECF No. 33 at 6-7.)  In contrast,
     the numerous HCS Request Forms submitted by defendant include notations demonstrating that

28  they were received by MCSP medical staff and processed.  (See ECF No. 29-3 at 60-83.)

1    While noting that plaintiff denied methamphetamine use, Dr. Tseng concluded that "Pt

2  clearly has no reason to be on narcotics, esp. [with] polysubstance abuse hx & lack of organic

3  pain generator." (Barnett Decl., Ex. B (ECF No. 29-3) at 40.)  Dr. Tseng opined that only non-

4  steroidal anti-inflammatory drugs (NSAIDs), like ibuprofen or acetaminophen, were appropriate

5  for plaintiff.  (DUF 76-7, 79.)  At that time Dr. Tseng offered to prescribe a tapering regimen for

6  the remainder of plaintiff's Tramadol prescription, in order to avoid him suffering withdrawal

7  symptoms, noting in his treatment notes that, "I offered pt choice of tapering Tramadol, but pt

8  wishes to leave Rx alone, despite the fact that his Tramadol will expire on 2/5.  Pt threatened to

9  sue me because I wouldn't give him his pain med." (Barnett Decl., Ex. B (ECF No. 29-3 at 40).)

10    In his declaration filed in support of the pending summary judgment motion Dr. Tseng

11  explains:

> 12  Based upon my medical examination of Elliott and review of his
> medical records, I informed Elliott that tramadol was not medically
> 13  indicated; that only NSAIDs, like Ibuprofen, or Acetaminophen
> (Tylenol) were appropriate; and that Elliott's prescription for
> 14  tramadol would not be renewed when it expired on February 5,
> 2011, but that he could be tapered from the medication . . . .  Elliott
> 15  objected to the discontinuation of tramadol and refused my offer to
> taper his doses of the medication.  Instead, he elected to continue
> 16  taking un-tapered doses of tramadol until the prescription expired.

17  (Tseng Decl. ¶¶ 24, 26.  See also DUF 77, 79-81.)

18    Plaintiff received his last dose of Tramadol on February 5, 2011.  On February 6,

19  2011, plaintiff submitted a HCS Request Form, complaining of "severe pain, and withdrawal

20  symptoms." (ECF No. 33 at 6.)  On that same day plaintiff submitted an administrative grievance

21  (MCSP Log No. 16-11-10284), challenging the discontinuance of his prescription for Tramadol.

22    On February 9, 2011, Dr. Tseng examined plaintiff for the withdrawal symptoms of

23  "chills, bones aching, can't sleep at night." (Barnett Decl., Ex. B (ECF No. 29-3 at 41).)  At that

24  time defendant Dr. Tseng noted the following:

> 25  Pt subsequently falsified statements on 2/6/11 '7362' [Health Care
> Services Request Form] stating that I did not prescribe a tapering
> 26  regimen where clearly on 1/19/1[1] I offered him a tapering
> regimen and pt chose to not have a taper off his Tramadol . . . .  Pt
> 27  with polysubstance hx & discordance between what he tells me &
> what he documented . . .  obvious misinformation written in 7362
> 28  dated 2/6/11.  This is all consistent with drug seeking behavior in pt

> with polysubstance abuse/dependence – ongoing.   Pt has
> unnecessary 602s regarding my medical mgmnt.  Rx NSAIDs only
> – no opiates are appropriate.

(Id.)  On that same date Dr. Tseng prescribed Motrin (ibuprofen), 600 mg twice a day as needed for pain, for four months, and advised plaintiff "not to take more ibuprofen than prescribed."  (Id. at 41-2.)  Dr. Tseng noted that he would schedule plaintiff for a Pain Management Intake assessment in 4 to 8 weeks.  (Id. at 41.)

On February 17, 2011, plaintiff was seen by RN Knapp, for complaints of chronic low back pain, chronic hip pain and left shoulder pain.  Plaintiff stated that the ibuprofen did not reduce his symptoms, and again requested prescriptions for Tramadol and Neurontin.  (Id. at 43.)  Plaintiff's request was denied on the ground that there were no changes in objective findings since his February 9, 2011 appointment.  Plaintiff rejected the offered "RN protocol analgesic."  (Id.)

On March 9, 2011, plaintiff was interviewed by Dr. J. Soltanian, in response to his administrative grievance.   Dr. Soltanian "partially granted" the grievance for the following reasons:

> You have been seen by Dr. Tseng twice on 01/19/11 and 02/09/11.
> I found the medical care provided to be appropriate.  Your pain
> management intake appointment is pending and you will be referred
> to the pain management committee.  Monetary compensation is
> beyond the scope of the appeal process and will not be addressed.

(Barnett Decl., Ex. B (ECF No. 29-3 at 47).)

On March 21, 2011, Dr. Tseng examined and interviewed plaintiff and completed a Chronic Pain Intake Sheet.  (Id. at 44-5).)  At that time plaintiff complained of chronic low back pain, right hip pain and left shoulder pain.  Plaintiff reported that his pain level was a "6" on an ascending scale from 0 to 10.  Plaintiff reported that Tramadol, particularly in combination with Neurontin, had been effective in relieving his symptoms.  Dr. Tseng noted plaintiff's prior history of abusing "THC, speed, ETOH."  (Id. at 44.)  After examining plaintiff, Dr. Tseng made the following clinical assessment:  "Chronic Pain, no consistency in exam or objective findings.  Imaging/EMG fail to identify objection pain generator.  Suspect non-organic pain sxs

1  [symptoms]." (Id. at 45.)  Dr. Tseng referred plaintiff to the Pain Management Committee at that

2  time.

3         On March 28, 2011, PA Akintola completed a progress note concerning the matters set

4  forth in plaintiff's administrative grievance.  Plaintiff stated that he wanted an award of monetary

5  damages for the discontinuance of his Tramadol, and threatened to sue Dr. Tseng.  PA Akintola

6  informed plaintiff that monetary damages were beyond the scope of his grievance, and that the

7  Pain Management Committee would soon follow up on his March 21, 2011 referral.  (Id. at 48.)[8]

8         Plaintiff's treatment records note an October 20, 2011 Pain Management Committee

9  decision recommending that plaintiff avoid opiates and anticonvulsants.  (Id. at 54.)  On

10  November 22, 2011, plaintiff commenced the instant action.  (ECF No. 1.)[9]

11         On February 16, 2012, defendant Dr. Tseng evaluated plaintiff for pain management

12  follow-up.  At that time plaintiff complained of chronic low back pain radiating down his right

13  leg, with pain levels from 3 to 8, averaging 6 and stated that he got stiff when stationary.  Dr.

14  Tseng noted that plaintiff "[t]akes ibuprofen, which seems to provide some benefit."  (Id. at 54.)

15  Dr. Tseng also noted that plaintiff's "prior over-reaction to light touch and non-physiological pain

16  responses are not present today," and that plaintiff was "calm and very cooperative with the

17  exam."  (Id.)  Dr. Tseng noted the October 2008 MRI findings of degenerative disc disease at L4-

18  L5, and diagnosed "mild mechanical low back pain," with "extremely mild muscle stiffness and

19  tightness without significant evidence of organic pathology."  (Id.)  Dr. Tseng also observed that

20  plaintiff's "ADL [activities of daily living] function remains unimpaired and independent."  (Id.)

21  Plaintiff was advised at that appointment to continue taking ibuprofen, to exercise, and to return

22  in 180 days for a CCP pain management follow-up.

23

24  ───────────────

[8]  On June 7, 2011, plaintiff's prescription for ibuprofen was refilled for 90 days.  (Id. at 50.)

25  The next entry in plaintiff's submitted medical record is dated several months later, on December 5, 2011, when Dr. Tseng prescribed Septra DS ointment to treat cellulitis on plaintiff's right toe

26  following an injury.  (Id. at 52.)

27  [9]  On December 23, 2011, PA Akintola noted that plaintiff refused his scheduled progress appointment, stating that plaintiff "has got the case in court now."  (Barnett Decl., Ex. B (ECF

28  No. 29-3) at 53.)

1    A May 23, 2012 medication reconciliation record indicates that plaintiff was then taking

2    800 mg ibuprofen, three times a day as needed.  (Id. at 51.)  On May 24, 2012, plaintiff was seen

3    by defendant Dr. Tseng for routine follow-up regarding his hepatitis condition.  At that time,

4    according to Dr. Tseng, plaintiff stated that he had no new symptoms, and lab results showed

5    "minimal evidence of inflammation and fibrosis," thus warranting only routine monitoring and

6    another set of lab tests in a year.  (Id. at 55.)  Dr. Tseng noted that plaintiff was on "high dose

7    NSAID use," but that he "says he needs it for his chronic pain symptoms and doesn't want to

8    lower his dose."  (Id.)  Plaintiff stated that the ibuprofen did not cause him gastrointestinal

9    stomach upset if he took it with food, but Dr. Tseng nonetheless prescribed Omeprazole to treat

10   any such side effects.  (Id.)

11   On August 10, 2012, plaintiff was again seen by defendant Dr. Tseng for pain

12   management follow-up.  Plaintiff again complained of chronic low back pain radiating down his

13   right leg and stiffness, with pain levels from 5 to 8, averaging 6-7.  Plaintiff stated that the pain

14   was less when he moved and was worse when it was cold.  Dr. Tseng again noted that plaintiff

15   "[t]akes ibuprofen, which seems to provide some benefit."  (Id. at 56.)  However, plaintiff refused

16   a physical exam or to sign a CDC Form 7225 (Refusal of Examination and/or Treatment), and

17   reportedly stated, in the company of witnesses:

18   
19              I don't know why we have to go through this rigmarole.  I have a
            lawsuit against you and I don't think this is pertinent . . . .  I'm not
            going to see you again for this.  I have a lawsuit against you.  And
            when the[] next doctor comes, I'm going to sue him too.
20

21   (Id.)  At that time Dr. Tseng opined that, "[g]iven patient's behavior, cannot r/o secondary gain or

22   drug seeking behavior," and concluded that plaintiff should be discontinued from the pain

23   management program because he "is refusing continued evaluation."  (Id.)  However, Dr. Tseng

24   concluded that plaintiff would remain in the CCP for his hepatitis condition and did continue

25   plaintiff's prescriptions for ibuprofen and Omeprazole.

26   On October 24, 2012, Dr. Soltanian saw plaintiff in response to his request for another

27   primary care doctor.  Dr. Soltanian informed plaintiff that inmates could not select their doctors,

28   and that plaintiff would not continue to be prescribed pain medications if he did not cooperate

1     with examinations and workups.  (Id. at 57.)

2            On November 7, 2012, plaintiff was again seen by defendant Dr. Tseng for hepatitis care

3     follow-up.  Plaintiff stated then he had no new symptoms but had occasional feelings in his right

4     side.  Plaintiff reported taking 800 mg ibuprofen three times a day, without stomach upset as long

5     as he took it with food, and so had not been taking the Omeprazole.  Plaintiff obtained a referral

6     for a new hepatitis assessment in six-months.  Plaintiff again stated that he needed the high dose

7     NSAID to treat his chronic pain symptoms, and did not want to lower the dose.  (Id. at 58.)

8            On July 15, 2013, PA C. Cuppy, supervised by Dr. C. Smith, M.D., provided follow-up

9     care for plaintiff's spine and an injured elbow he had suffered.  Plaintiff stated then that he had no

10    new complaints; that his neck and back pain had improved; and that he avoided positions that

11    increased his pain symptoms.  (Id. at 59.)

12           From March 9, 2011, through January 6, 2013, plaintiff regularly submitted HCS Request

13    Forms requesting renewal of his ibuprofen prescription, which were approved by medical staff.

14    In none of these requests did plaintiff seek a pain medication other than ibuprofen.  (See Barnett

15    Decl., Ex. B (ECF No. 29-3 at 60-83).)[10]

16    **II.  Plaintiff's Evidence and Arguments**

17           Plaintiff's opposition to the pending motion is supported by his verified complaint, sworn

18    deposition testimony, exhibits in support of his statement of disputed facts,[11] and opposition to

19

20    [10]  These HCS Request Forms each requested, nearly verbatim, to "Please refill my Ibuprofen as
      soon as possible.  Thank you."  The requests were submitted by plaintiff on March 9, 2011,
21    March 31, 2011, April 27, 2011, May 11, 2011, May 19, 2011, June 2, 2011, June 12, 2011, July
      7, 2011, July 25, 2011, August 4, 2011, November 28, 2011, December 2, 2011, January 27,
22    2012, February 23, 2012, March 29, 2012, May 4, 2012, June 4, 2012, July 2, 2012, July 30,
      2012, August 31, 2012, September 1, 2012, October 30, 2012, December 7, 2012, and January 6,
23    2013.  (See ECF No. 29-3 at 60-83.)

24
      [11]  Defense counsel has submitted formal objections to plaintiff's evidence.  (See ECF No. 39.)
25    Insofar as defendants' objections are relevant to the court's disposition of the pending motion for
      summary judgment as set forth herein, they are overruled.  The undersigned finds it would be an
26    abuse of discretion to refuse to consider evidence offered by a pro se plaintiff at the summary
      judgment stage.  See e.g. Jones v. Blanas, 393 F.3d 918, 935 (9th Cir.2004) (reversing and
27    remanding with instructions to consider evidence offered by the pro se plaintiff in his objections
      to the findings and recommendations).
28

1  defendant's statement of undisputed facts.  The evidence submitted by plaintiff in support of his

2  opposition to defendants' motion for summary judgment establishes the following.

3     While incarcerated at PVSP, plaintiff was a patient in the CCP for treatment of Hepatitis

4  C (stage one, grade one) and chronic lower back pain.  In April 2010, plaintiff's medications

5  included Tramadol, 50 mg per day, and Neurontin, 600 mg every morning and noon and 800 mg

6  every evening.  (Pl.'s Statement of Disputed Facts (PSDF), Ex. D (ECF No. 33 at 18) (April 6,

7  2010 Medical Progress Note).)  In December 2011, plaintiff continued to exhibit minimal

8  evidence of advanced liver disease and was not on hepatitis medications.  (Barnett Decl., Ex. B

9  (ECF No. 29-3 at 52) (Dec. 5, 2011 Progress Note).)

10     Plaintiff contends that his prison medical records are inaccurate to the extent they depict

11  exaggerated pain responses upon physical examination.  (Pl.'s Oppo. to DUF 8, 96.)  Plaintiff

12  asserts that he has in fact suffered severe chronic lower back pain and headaches since being

13  injured at PVSP in March of 2008.  According to plaintiff, these symptoms have significantly

14  interfered with his performance of daily activities, and have become worse since he has been

15  denied the previously prescribed Tramadol.  At deposition, plaintiff testified that he experienced

16  the following withdrawal symptoms when Tramadol was discontinued:

17      I couldn't sleep at night.  I would get chills, just going through
18      opiate withdrawal. I was in pain.  I started to experience more pain.
    . . . [i]n my lower back . . . .  If I sat for more than an hour or two,
19      I'd get stiff . . . .

              * * *
20
21      I didn't sleep for a whole week.

22  (Pl. Depo at 31, 38 (Chinn Decl., Ex. A; ECF No. 29-5 at 21, 27).)  Plaintiff also testified at

23  deposition that his pain remains at a level of "probably 6, 7," because ibuprofen is ineffective in

24  providing him relief.  (Pl. Depo. at 30, 35 (Chinn Decl., Ex. A; ECF No. 29-5 at 20, 24).)

25     Plaintiff also contends that the objective findings support his subjective complaints of

26  pain.  Although the October 2008 MRI of plaintiff's spine showed degenerative disc disease at

27  L4-L5 without herniation, it also demonstrated a reduced signal, loss of disc space height, and

28  bulging of the annulus at L4-L5.  (Pl.'s Oppo. to DUF 41-4; 47-8; 50; 70; 72-3; 118; 129; PSDF,

Ex. A (ECF No. 33 at 4).)  Moreover, despite the radiological evidence that his facial fractures

have healed,[12] plaintiff claims that he still suffers from severe headaches.  (Pl.'s Oppo. to DUF

39.)  Plaintiff also contends that ibuprofen has not, and does not now, adequately treat his pain.

In contrast, the long-term use of Tramadol effectively treated his chronic pain.  (DUF 35.)  As

documented in plaintiff's April 6, 2010 Medical Progress Note, plaintiff's back pain was under

control with Tramadol, and his neuropathy was well-controlled with Neurontin.  (Pl.'s Oppo. to

DUF 68-9; 71; 77-8; 106-09; 119-20; 130; PSDF, Ex. D (ECF No. 33 at 18).)  Plaintiff concedes

that he has a history of alcohol and marijuana use, but denies using any other drugs, including

methamphetamine.  (DUF 9; Pl.'s Oppo. to DUF 76.)

 Plaintiff contends that Dr. Tseng did not offer to provide the "necessary taper" of his

prescription for Tramadol.  (DUF 83-5 (acknowledging plaintiff's allegation); Pl.'s Oppo. to DUF

79-82 (denying that Dr. Tseng offered to taper).)   In support of this allegation, plaintiff directs

the court to the HCS Request Forms he submitted on February 6 and February 13, 2011; his

administrative grievance submitted on February 6, 2011; and the fact that he did not sign a CDC

Form 7225 (Refusal of Examination and/or Treatment).

 In his HCS Request Form, submitted February 6, 2011, plaintiff alleged in full (PSDF, Ex.

B (ECF No. 33) at 6) as follows:

> I need to see the doctor to address the sever[e] pain in my lower
> back, right hip, and left shoulder.  Dr. Sing [sic] has refused to
> renew my pain medication, and prescribe the proper tapering
> regime mandated by the pain management guideline.  I have also
> not received any treatment for the right lower extremity peroneal
> motor Neuropathy that cases me severe[e] pain and numbness.

---

[12]  The October 2008 x-rays of plaintiff's facial bones were apparently incomplete.  The x-ray
report provided in pertinent part:

> Facial bones:  Water's Caldwell and both lateral views of the facial
> bones are inadequate for proper evaluation of trauma.  No acute
> bony injury is seen on this limited study.  Visualized paranasal
> sinuses are clear.  No free air is seen in the orbits.

> Impression: Limited examination of the facial bones showing no
> abnormalities.

(Barnett Decl., Ex. B (ECF No. 29-3 at 28).)

1  In his HCS Request Form, submitted February 13, 2011, plaintiff alleged in full (PSDF,

2  Ex. B (ECF No. 330 at 7) as follows:

> I need to see the doctor to address the sever[e] pain in my lower
> back, right hip, and left shoulder.  Dr. Tseng has refused to renew
> my pain medication, and prescribed motrin, which does not
> alleviate my pain.  Dr. Sing [sic] also failed to prescribe the proper
> tapering regime mandated by the pain management guideline.  I
> continue to suffer sever[e] pain, and withdrawal symptoms due to
> Dr. Tseng's "Deliberate Indifference" to my medical needs.

7  In his administrative grievance submitted February 6, 2011 (MCSP Log No. 16-11-

8  10284), plaintiff challenged the discontinuance of his Tramadol prescription.  Plaintiff alleged

9  therein that Dr. Tseng informed him "that he was not going to give me anything after my

10 medication expired on February 5, 2011," and "would not re-order my pain medication or

11 prescribe a tapering regime . . . ."  (Compl., Ex. B (ECF No. 1) at 24.)  Plaintiff further alleged

12 that, due to Dr. Tseng's "medical 'Negligence, and Deliberate Indifference[,]' I continue to suffer

13 chronic pain and severe withdrawal symptoms."  (Id.)  Plaintiff requested that he be "referred to

14 the local medical leadership via existing institution committee structure i.e., P&T, MAR, or

15 Narcotic/pain committee;" that his Tramadol "be re-ordered as soon as possible;" and that he

16 "receive monetary compensation." [13]  (Id.)

17 Following Dr. Soltanian's "partial grant" of plaintiff's grievance on March 9, 2011 - based

18 on his finding that the medical care provided to plaintiff in January and February 2011 was

19 appropriate and that plaintiff's pain management intake appointment was pending) - plaintiff

---

[13]  In his administrative grievance, plaintiff alleged as follows:

> On January 19, 2011, I was seen by doctor S. Sing [sic], to have my
> pain medication Tramadol renewed.  I was informed by doctor Sing
> [sic] that he would not re-order my pain medication or prescribe a
> tapering regime that was consistent with the pain management
> guideline.  I informed Dr. Sing [sic], that if he was not going to
> renew my pain medication that he needed to start me on a tapering
> regime and that Tramadol which is an opioid should not be abruptly
> discontinued.  (See Pain Management tapering guideline.)  He
> informed that that he was not going to give me anything after my
> medication expired on February 5, 2011.  Due to doctor Sing's
> medical "Negligence" and "Deliberate Indifference" I continue to
> suffer chronic pain and sever[e] withdrawal symptoms.

(Compl., Ex. B (ECF No. 1) at 24.)

19

sought review at the second level on the ground that his "severe back, hip and shoulder pain" had

not been addressed.  (Id. at 25, 23.)  At the second level of review HCS Chief Executive Officer

C. Schutt, R.N., B.S.N., again "partially granted" the grievance insofar as plaintiff's request to be

referred to the pain management committee was still pending.[14]  Plaintiff then sought review at

the third level on the ground that he was "experience[ing] chronic pain daily.  I have not been

seen by the pain management committee even though it has been granted.  Dr. S. Tseng refuses to

treat my painful condition or order the proper medical test to determine the cause of my pain."

(Id. at 25.)  Plaintiff's administrative grievance was once again denied at the third level of review

/////

---

[14]  HCS CEO Schutt "partially granted" plaintiff's grievance at the second level of review on the following grounds:

> January 19, 2011 you were seen by Dr. Tseng and he determined Tramadol was not medically necessary.  Dr. Tseng said he offered you a choice of tapering off of Tramadol, but you said you wished to leave the prescription alone, despite the fact that it would expire on February 5, 2011.
>
> Your request to be referred to PT, the MAR Committee or the Pain Committee is partially granted.
>
> During your first level interview on March 9, 2011, Dr. Soltanian stated he found your medical care to be appropriate and informed you that you have a pain management intake appointment pending.
>
> March 21, 2011 you were seen in the Doctor (Dr.) Line and had a Chronic Pain Intake evaluation performed.
>
> You are currently prescribed Ibuprofen 600 mg tablets, one tablet, twice a day, as needed, for pain.
>
> There is no evidence to suggest any negligence or deliberate indifference to your medical needs.  You have full access to health care; you just do not have the authority to pick and choose what medications and accommodations your physicians feel is medically necessary.
>
> It is apparent from the review of your health care chart that your treatment here at Mule Creek State Prison (MCSP) had been appropriate and timely . . . .

(Compl., Ex. B (ECF No. 1) at 17-8.)

1  on the ground that he was receiving the treatment deemed medically necessary.[15]

2  Finally, plaintiff asserts that he never signed a CDC Form 7225 (Refusal of Examination

3  and/or Treatment).  (See Pl.'s Oppo. to DUF 80-1; and PSDF, Ex. E (Def.'s Answer to Pl.'s

4  Interrogatory No. 13).)  Plaintiff alleges that this omission demonstrates defendant Dr. Tseng's

5  failure to abide by the protocol set out in the Guidelines requiring that he taper the discontinuance

6  of plaintiff's Tramadol.  Plaintiff repeated this claim during his deposition testimony on May 30,

7  2013.  (Pl. Depo. at 6 (Chinn Decl., Ex. A; ECF No. 29-5 at 8).)

8  **III.  Discussion**

9  Although the issues are interrelated, the court addresses plaintiff's deliberate indifference

10  claims against defendant Dr. Tseng with respect to three distinct aspects of the medical care

11  provided to plaintiff.  Specifically, the undersigned will consider whether summary judgment is

12  appropriate with respect to the questions of was Dr. Tseng deliberately indifferent to plaintiff's

13  serious medical needs when he:  (1) discontinued plaintiff's prescription for Tramadol; (2) failed

14  to taper plaintiff off Tramadol before it was completely discontinued; and (3) instead prescribed

15  ibuprofen for plaintiff.  Viewing the evidence in the light most favorable to plaintiff, the court

16  must determine whether the record supports a reasonable inference that Dr. Tseng made each of

17  these three decisions regarding treatment despite knowing, and disregarding, an excessive risk to

18

19  _____

[15] Plaintiff's grievance was denied at the Third Level, for the following reasons:

20      The Department shall provide only medical services for patient-
    inmates that are based on medical necessity and supported by
21      outcome data as effective medical care.  In the absence of available
    outcome data for a specific case, treatment will be based on the
22      judgment of the physician that the treatment is considered effective
    for the purpose and is supported by diagnostic information and
23      consultations with appropriate specialists.  Your contention that you
    have not received adequate medical care is refuted by professional
24      health care staff familiar with your medical history, as well as a
    review of your medical records.

25      [   ] After review, there is no compelling evidence that warrants
26      intervention at the Director's Level of Review as your medical
    condition has been evaluated by licensed clinical staff and you are
27      receiving treatment deemed medically necessary.

28  (Compl., Ex. B (ECF No. 1) at 15-6.)

1   plaintiff's health.  Farmer, 511 U.S. at 837.  Before addressing each aspect of his medical care,

2   the court notes that in order to survive summary judgment at a minimum, plaintiff must

3   demonstrate a genuine and material dispute as to whether defendant Dr. Tseng was aware of facts

4   from which an inference could reasonably be drawn that his challenged conduct posed a

5   substantial risk of serious harm to plaintiff, and whether defendant drew such inference.  Id.; Fed.

6   R. Civ. P. 56(a).

7         **A.  Serious Medical Need**

8         Plaintiff's medical record recounts his subjective complaints of pain in his left shoulder,

9   right hip and lower back (sometimes radiating down his right leg), as well as headaches, although

10  his deliberate indifference claims appear to focus on his chronic lower back pain.  As a threshold

11  matter, the court finds that plaintiff's chronic pain symptoms, particularly in his lower back,

12  constitute objectively "serious medical needs" within the meaning of the Eighth Amendment.

13  See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (a serious medical need is one that a

14  reasonable doctor would find important and worthy of comment or treatment).  Defendant Dr.

15  Tseng does not contend otherwise.

16        **B.  Discontinuance of Tramadol**

17        The court's analysis commences with additional references to CDCR's Pain Management

18  Guidelines, upon which both parties rely.[16]  (See Compl., Ex. C (ECF No. 1 at 28-36); Barnett

19  Decl., Ex. D (ECF No. 29-3 at 87-95); PDF, Ex. C (ECF No. 33 at 9-16).)   As noted above, those

20  Guidelines were published in 2009, and were in effect throughout plaintiff's treatment by Dr.

21  Tseng.

22        As also previously noted, the Guidelines identify Tramadol as a short-term medication for

23  treating acute pain, and advise that "chronic use [is] not recommended."  Guidelines at 2.  See

24  also id. at 25, 35, 37, 55.  The Guidelines identify "Tylenol & Codeine #3 as the preferred 'weak'

_____

25  [16] The court may take judicial notice of state agency records and reports that are not subject to

26  reasonable dispute.  See e.g. City of Sausalito v. O'Neill, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004)
    (citation omitted).  Accordingly, the undersigned has taken judicial notice of the Guidelines in

27  their entirety, which are available online.  See PDF listings at:  http://www.cphcs.ca.gov /serp.
    aspx?q=%22pain+management%22&cx=001779225245372747843%3Akkktvnwysgi&cof=FOR

28  ID%3A10&ie=UTF-8.

1    opioid of choice" in the first instance, if non-opioid medications (acetaminophen or ibuprofen)

2    have been ineffective.  Id. at 55.  "[I]f Tylenol #3 is ineffective or contraindicated Tramadol

3    (nonformulary) may be used short-term."  Id.  It is recommended that Tramadol be used to treat

4    acute pain for no more than 10 days.  Id. at 25.  The Guidelines specifically provide that "[t]he

5    CPHCS Pain Committee does not recommend long-term use of Tramadol," id. at 55, and caution

6    that "[o]pioids are associated with potentially serious harm including opioid-related adverse

7    events and abuse potential," id. at 70.

8         The Guidelines also recommend that pharmacologic treatment for chronic pain be

9    prescribed in tandem with nonpharmacologic treatment, e.g., patient education, physical therapy

10   or other therapeutic exercise program, and psychological modalities such as cognitive/behavioral

11   therapy, relaxation, and imagery.  Id. at 1-4, 38-51, 70.  The Guidelines recommend that no

12   opioid be prescribed for long-term treatment of noncancer chronic pain unless the provider has:

13   (1) "tried all other medication classes at adequate doses for adequate length of time without

14   acceptable relief;" (2) "weigh[s] the risks and benefits, especially considering the patient's co-

15   morbid medical, psychiatric and if present, substance abuse history;" and (3) finds a "clear

16   medical indication with objective data supporting the diagnosis," or refers the patient to, and

17   relies on the opinion of, a pain management committee or specialist.  Id. at 70.  Contraindications

18   to opioid therapy include noncompliance with other treatment recommendations, psychiatric

19   instability and current substance abuse disorder.  Id. at 71.

20        These Guidelines addressed the standard of care for pain management by physicians

21   treating California prison inmates.  Dr. Tseng was required to follow those Guidelines to the

22   extent they were consistent with his professional medical opinion in treating plaintiff.  Here, the

23   Guidelines expressly support Dr. Tseng's treating decision to discontinue treating plaintiff with

24   Tramadol, by recommending Tramadol be prescribed only for short-term use and only after

25   NSAIDs and Tylenol/Codeine were proven to be ineffective.  Plaintiff's medical record indicates

26   that Tramadol was the pain reliever of first choice utilized by PSVP physicians following his

27   March 2008 injuries.  The prescription was not reconsidered by PVSP medical staff until

28   December 2010, when PA Wilson "question[ed] the need for Max dose Tramadol," and found

1    plaintiff's "[r]eports of pain not consistent with exam," and "no physical findings to support

2    needing TID Neurontin." (Barnett Decl., Ex. B (ECF No. 29-3 at 36).)  While plaintiff was

3    immediately tapered off Neurontin and that prescription was discontinued by the time he was

4    transferred to MCSP in January 2011, his Tramadol prescription had still remained unchanged.

5            Meanwhile, in April 2008, PVSP staff psychologist Dr. Gonzalez found that plaintiff had

6    a history of substance abuse, including methamphetamine abuse, and diagnosed plaintiff as

7    suffering from anxiety, depression and possible antisocial personality disorder.  Despite these

8    findings, and the 2009 release of the Guidelines noting contraindications to opioid therapy in

9    patients with psychiatric instability and current substance abuse disorder, still no changes were

10   made to plaintiff's Tramadol prescription.   When plaintiff transferred to MCSP, Dr. Tseng's

11   decision to discontinue treating plaintiff with Tramadol was fully consistent with the Guidelines'

12   proscriptions against prescribing Tramadol for patients with chronic pain, psychiatric instability

13   and current substance abuse disorder.[17]  These factors supported Dr. Tseng's assessment that

14   plaintiff's continued use of Tramadol posed a greater risk to his health than its discontinuance.

15   Dr. Tseng's decision was further validated by plaintiff's subsequent refusals to participate in

16   physical therapy (despite four opportunities to do so), and his refusal to submit to physical exams

17   by PA Akintola (in December 2011) and Dr. Tseng (in August 2012), based on the Guideline's

18   proscription against prescribing opioids to patients who are noncompliant with adjunct treatment

19   options.  Guidelines, at 71.

20           Given this evidence submitted on summary judgment, the undersigned finds no evidence

21   to sustain a reasonable inference that Dr. Tseng knew of, and disregarded, a substantial risk of

22   /////

23   /////

24   _____

25   [17] Although plaintiff simply denies any history of methamphetamine use, the evidence before the
     court establishes that his history of methamphetamine use was well-established at the time of his

26   sentencing in January of 2006.  Moreover, plaintiff does not deny his history of marijuana use.  In
     any event, rather than emphasize plaintiff's past substance abuse Dr. Tseng found, when

27   conducting his first examination on February 9, 2011, that plaintiff exhibited then current "drug
     seeking behavior" and hence assessed plaintiff as suffering from "polysubstance

28   abuse/dependence – ongoing."  (Barnett Decl., Ex. B (ECF No. 29-3) at 41.)

1  serious harm to plaintiff when he discontinued plaintiff's prescription for Tramadol.[18]

2  **C.  Failure to Taper Tramadol**

3         The parties agree that the Guidelines provide for a tapering period when ending an

4  inmate's prescription for opioids.  Specifically, they provide that "[o]pioids should not be

5  abruptly discontinued," (Guidelines, at 71), and advise that "[g]enerally, the longer a patient is on

6  an opioid and the higher the dose, the slower the taper should be," id. at 72.  For short-acting

7  opioids, the suggested tapering regimen is as follows:

8                 Decrease dose by 10% every 3-7 days, OR. . .

9                 Decrease dose by 20% - 50% per day until lowest available dosage
                  form is reached . . . .
10
                  Then increase the dosing interval, eliminating one dose every 2-5
11                 days.

12  Id. at 72.  The Guidelines also provide, however, that "[t]here is no single protocol that has been

13  proven more efficacious than another," and "[t]he schedule should be made on an individual basis

14  given the patient's complexity."  Id.[19]

15         Defendant Dr. Tseng acknowledges that tapering off Tramadol use is supported by the

16  Guidelines, but opines that it is not required:

17                 Tramadol is fairly mild in comparison to opiates such as morphine
                  and methadone, and doesn't require a long tapering dose.
18                 Typically, tapering the doses of tramadol may be completed within
                  one to two weeks.  Withdrawal syndromes may occur if tramadol is
19                 discontinued abruptly.  A particular patient experiences withdrawal
                  symptoms differently, depending on each patient's case.    The
20                 withdrawal symptoms would be fairly mild including:  generalized
                  body aches and flu-like symptoms for as long as 3-7 days, or up to
21                 two weeks.  But it is medically implausible that any withdrawal
                  symptoms would last much longer than two weeks.  Thus, it is my
22                 medical   opinion   that   tapering   off   tramadol   is   generally
                  recommended, but not required.
23

24  (Tseng Decl. ¶ 25.)

25  _____
    [18]  As discussed more fully herein, this assessment is underscored by Dr. Tseng's offer to taper
26  plaintiff's use of Tramadol for the remainder of the time his prescription remained valid, and by
    providing an alternative pain medication.
27
    [19]  Tramadol is not expressly included in the tapering protocol under the Guidelines but, as an
28  opioid agonist, its inclusion is properly inferred by the parties and the undersigned.

                                                  25

1    Similarly, Dr. Barnett has opined:

2
3            There is no requirement to taper tramadol  A well-respected and
            oft-used protocol for suspending narcotic use in addicts is simply to
            stop the drug and treat withdrawal symptoms if and as they appear.
4            To use this protocol is not inconsistent with the [Guidelines] . . .
            [which] note that tapering 'should be made on an individual basis.'
5            In Elliot's case, since he refused to follow the advice of his
            physician to have his drug tapered over time, Dr. Tseng had no
6            choice but to observe Elliott for withdrawal symptoms after his
            tramadol prescription ran out.  It is my opinion that Dr. Tseng is not
7            responsible for the transient withdrawal symptoms of chills and
            insomnia in the week following the cessation of Elliot's tramadol.

8    (Barnett Decl. ¶ 16.)

9    Dr. Tseng's treatment notes are before the court on summary judgment and reflect his

10   offer to taper plaintiff's Tramadol for the time remaining on his prescription, from January 11,

11   2011 through February 5, 2011, as well as plaintiff's refusal of that offer.  (See Barnett Decl., Ex.

12   B (ECF No. 29-3 at 40-1); see also Tseng Decl. ¶¶ 24, 26.)  Dr. Tseng's offer to taper plaintiff's

13   Tramadol for the twenty-five days remaining of plaintiff's prescription was consistent with his

14   professional opinion that such tapering could be completed within one to two weeks (Tseng Decl.

15   ¶ 25), and was within the Guidelines' recommended tapering regimen (see Guidelines at 72).

16   In opposing summary judgment plaintiff only vaguely disputes this evidence, insisting

17   generally in both his complaint and his opposition to the pending motion that Dr. Tseng failed to

18   offer him "the necessary tapering regime mandated by the Pain Management Guideline."[20]

19   Plaintiff does not allege that Dr. Tseng failed to offer to taper him off of Tramadol over the

20   remainder of his prescription.  The court construes plaintiff's contention to be that Dr. Tseng

21   refused to taper plaintiff's Tramadol beyond the prescription's expiration on February 5, 2011.

22   _____

23   [20]  In his opposition to the pending motion, plaintiff contends that the following questions are
     material factual disputes concerning the tapering of his Tramadol that preclude the granting of
24   summary judgment:  (1) "Whether the plaintiff was offered the necessary (Tramadol) tapering
     regime mandated by the Pain Management Guideline;" and (2) "Whether the plaintiff refused the
25   necessary (Tramadol) tapering regime mandated by the Pain Management Guideline."  (Pl.'s SDF
     1, 2 (ECF No. 33 at 2).)  The allegations of plaintiff's complaint are similarly general and vague,
26   asserting only that Dr. Tseng informed plaintiff that he "would not renew the Plaintiff's
     medication after it expired;" "refused to prescribe the necessary tapering regime mandated by the
27   pain management guideline;" and "refus[ed] . . . to take the necessary steps to ensure that Plaintiff
     received the proper tapering regime."  (Compl. at ¶¶ 11, 15, 22.)  Similarly general are plaintiff's
28   statements in his administrative grievance and pertinent HCS Request Forms.

1          Plaintiff asserts that the alleged failure of Dr. Tseng to offer "the necessary tapering

2  regime" is demonstrated by the absence of a completed CDC Form 7225 (Refusal of Examination

3  and/or Treatment) acknowledging plaintiff's refusal to accept a taper.[21]   Defendant Dr. Tseng

4  responds that plaintiff "was not required to sign a 'Refusal of treatment' (CDC 7225) form when

5  he refused my offer to taper the medication before his prescription expired," because "tapering

6  medication is not considered a 'treatment' for pain."  (Tseng Decl. at ¶ 27.)  Dr. Tseng's

7  assessment is consistent with the language of Form 7225, which is clearly intended to reflect an

8  inmate's informed and deliberate decision to refuse an affirmatively prescribed treatment or

9  examination,[22] rather than the discontinuance of a treatment that is no longer being prescribed.

10  Likewise, the underlying CDCR regulation provides in pertinent part that "[h]ealth care

11  treatment, including medication, shall not be forced over the objections of [] a mentally

12  competent inmate . . . except in an emergency . . . ."  15 Cal. Code Reg. § 3351(a).  Therefore, Dr.

13  Tseng's position that plaintiff was not required to sign a Form 7225 acknowledging his refusal to

14  accept a tapering off from Tramadol is supported and the absence of a signed form is not material

15  to the question whether Dr. Tseng offered to taper plaintiff off of Tramadol.  Rather, as Dr. Tseng

16  states, "[i]t was well within [plaintiff's] rights as a patient to decline my offer to taper his

17  tramadol doses."  (Tseng Decl. at ¶ 27.)

18  /////

19

---

20  [21]  The only record reference to a Form 7225 is plaintiff's refusal to sign a completed Form 7225

21  acknowledging his refusal to cooperate with Dr. Tseng in conducting a physical examination on
August 10, 2012.  (See Barnett Decl., Ex. B (ECF No. 29-3) at 56.)

22  [22] CDC Form 7225 (Refusal of Examination and/or Treatment) requires that the prison medical

23  provider "[d]escribe the examination and/or treatment refused as well as the risks and benefits of
the intervention."  (CDC 7225 (Rev 04/03).)  It then provides for the inmate's signature, in

24  acknowledgment of the following:

25          Having been fully informed of the risks and possible consequences
involved in refusal of the examination and/or treatment in the

26          manner and time prescribed for me, I nevertheless refuse to accept
such examination and/or treatment.  I agree to hold the Department

27          of Corrections, the staff of the medical department and institution
free of any responsibility for injury or complications that may result

28          from my refusal of this examination and/or treatment[.]

1    Nevertheless, it is undisputed that plaintiff experienced withdrawal symptoms after taking

2    his last dose of Tramadol on February 5, 2011.  Plaintiff alleges that he experienced the

3    following:  "severe pain" (Feb. 6, 2011 HCS Request Form (ECF No. 33) at 6); "chills, bones

4    aching, can't sleep at night" (Feb. 9, 2011 exam with Dr. Tseng (Barnett Decl., Ex. B (ECF No.

5    29-3) at 41); chills, heightened pain (especially in plaintiff's lower back which would become

6    stiff if plaintiff "sat for more than an hour or two"), and inability to sleep "for a whole week" (Pl.

7    May 30, 2013 Depo at 31, 38 (Chinn Decl., Ex. A; ECF No. 29-5) at 21, 27).

8    However, plaintiff has presented no evidence on summary judgment to refute the

9    assessments of both defendant Dr. Tseng and Dr. Barnett that plaintiff experienced temporary

10   withdrawal symptoms as a result of his own choice to take the remainder of his Tramadol

11   prescription at full strength rather than accept Dr. Tseng's offer to taper off of it.  Plaintiff does

12   not argue that Dr. Tseng was required to override plaintiff's decision in this regard, but appears to

13   contend that Dr. Tseng was deliberately indifferent in failing to treat plaintiff's at least somewhat

14   self-imposed withdrawal symptoms.  Plaintiff does not address how Dr. Tseng should have

15   treated plaintiff's chills and difficulty sleeping.  However, it is reasonable to infer that plaintiff's

16   increased pain symptoms may have been minimized had an alternate prescription for pain relief

17   been in place immediately after the discontinuance of plaintiff's Tramadol.  Nevertheless, the

18   evidence on summary judgment establishes that defendant Dr. Tseng did prescribe ibuprofen

19   within four days thereafter, when he examined plaintiff on February 9, 2011 (Barnett Decl., Ex. B

20   (ECF No. 29-3 at 41-2)), rendering plaintiff without pain medication for only three full days -

21   February 6 through 8, 2011.

22   Plaintiff has presented no evidence on summary judgment demonstrating that his pain

23   level during this brief withdrawal period was so significant that failing to treat it more effectively

24   reflected deliberate indifference on the part of defendant Dr. Tseng.  As a general matter,

25   plaintiff's back pain is chronic and not inherently disabling, presenting a less urgent need for

26   treatment than acute significant pain, e.g. post-surgical or post-injury pain.  More specifically, the

27   evidence submitted on summary judgment is replete with opinions of medical providers that

28   plaintiff's subjective complaints of pain exceeded objective findings.  Defendant Dr. Tseng

1    expressly found that plaintiff was exaggerating his pain symptoms and exhibiting drug-seeking

2    behavior, including falsifying statements concerning the medical care provided by Dr. Tseng.

3          In short, there is no evidence before the court to sustain a finding that Dr. Tseng knew of,

4    and disregarded, a substantial risk of harm to plaintiff by deferring for four days a prescription for

5    an alternate pain medication after plaintiff's Tramadol prescription expired.  Farmer, 511 U.S. at

6    837.  Moreover, as set forth in the Guidelines, a treating physician discontinuing an opioid

7    prescription should do so on a schedule "made on an individual basis given the patient's

8    complexity."  Guidelines at 72.

9          For the reasons set forth above, the undersigned finds that the evidence before the court on

10   summary judgment establishes that defendant Dr. Tseng was not deliberately indifferent to

11   plaintiff's serious medical needs by offering to taper plaintiff off Tramadol only over the time

12   remaining on his existing prescription rather than to provide an extended taper period and a

13   renewed prescription, nor for failing to immediately treat plaintiff's temporary withdrawal

14   symptoms.

15          D.  **Alternative Prescription for Ibuprofen**

16          Finally, plaintiff contends that the ibuprofen[23] prescription he was provided was, and

17   remains, ineffective in treating his pain symptoms.  At his deposition, plaintiff testified that his

18   pain remains at a level of "probably 6, 7."  (Pl. Depo. at 30, 35 (Chinn Decl., Ex. A; ECF No. 29-

19   5 at 20, 24).)  Plaintiff's stated pain level must be accepted for purposes of this motion, and is

20   consistent with his ongoing treatment statements.  In February 2012, plaintiff reported a pain

21   level of 3 to 8, with an average pain level of 6.  (Barnett Decl., Ex. B (ECF No. 29-3) at 54.)  In

22   /////

23   /////

24   /////

25   /////

26

27   ─────────────────────
     [23]  Plaintiff was initially prescribed 600 mg ibuprofen twice a day.  Although the date of increase
     in dosage is not clear from the evidence before the court on summary judgment, as of May 2012,
28   plaintiff was taking 800 mg ibuprofen three times a day.

1   August 2012, plaintiff reported a pain level of 5 to 8, with an average pain level of 6-7.[24]  (Id. at

2   56.)

3           However, to prevail on a theory that defendant Dr. Tseng should have pursued another

4   course of medical treatment in his case, plaintiff must show that the chosen course of treatment

5   was "medically unacceptable under the circumstances," and that the defendant "chose this course

6   in conscious disregard of an excessive risk to plaintiff's health."  Jackson, 90 F.3d at 332

7   (citations omitted).  See also Toguchi, 391 F.3d at 1058.  Here, plaintiff has come forward with

8   no evidence on summary judgment suggesting that the treatment of his pain symptoms with

9   ibuprofen was medically unacceptable under these circumstances.  On the contrary, the evidence

10  before the court supports a finding of medical acceptability.  The Guidelines provide that

11  ibuprofen is a preferred medication for treating chronic pain, and that at least two different classes

12  of NSAIDs should be tried before finding them to be ineffective in a given case.  Guidelines at

13  70.  Plaintiff has not sought a second class of NSAID, e.g., Cox-II inhibitor.  Id.  Moreover,

14  plaintiff's ongoing prescription for ibuprofen is consistent with the recommendation of MCSP's

15  Pain Management Committee in his case (Barnett Decl., Ex. B (ECF No. 29-3) at 54), and has

16  been validated by the decisions of the other medical providers who have since treated plaintiff.

17  (See, e.g., id. at 43 (Feb. 17, 2011 treatment notes of RN Knapp); id. at 47 (Mar. 9, 2011 response

18  of Dr. Soltanian to plaintiff's administrative grievance); id. at 48 (Mar. 28, 2011 treatment notes

19  of PA Akintola); id. at 59 (July 15, 2013 treatment notes of PA Cuppy and Dr. Smith).

20          Plaintiff's challenge to his current pain management medication amounts to no more than

21  plaintiff's difference of opinion with defendant Dr. Tseng, as well as with the MCSP Pain

22  Management Committee and other MCSP medical providers regarding the pain medication he

23  _____

24  [24]  Nevertheless, the evidence on summary judgment shows that ibuprofen has been somewhat
    effective in treating plaintiff's pain.  Beginning March 9, 2011, one month after he was first

25  prescribed ibuprofen, through at least January 6, 2013, plaintiff regularly submitted HCS Request
    Forms requesting renewal of his ibuprofen while in none of these requests did plaintiff challenge

26  the effectiveness of ibuprofen, or seek a different pain medication.  (See n.9, above.)  Also, in
    November 2012, plaintiff stated that he needed to continue taking high doses of ibuprofen to treat

27  his chronic pain symptoms.  (Barnett Decl., Ex. B (ECF No. 29-3) at 58.)  Finally, in July of
    2013, plaintiff stated that he had no new complaints; that his neck and back pain had improved;

28  and that he avoided positions that increased his pain symptoms.  (Id. at 59.)

1   should receive.  However, "a plaintiff's showing of nothing more than 'a difference of medical

2   opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a matter

3   of law, to establish deliberate indifference."  Jackson, 90 F.3d at 332 (citing Sanchez, 891 F.2d at

4   242).  See also Snow, 681 F.3d at 987.

5          Finally, other decisions by judges of this court addressing challenges brought by prisoners

6   to the discontinuance of Tramadol or another opioid in favor of a NSAID by medical staff have

7   concluded that such decisions are medically acceptable. See e.g., Montiel v. Taher-Pour, No.

8   1:11cv2145 LJO DLB PC,  2014 WL 2574533 (E.D. Cal. June 09, 2014), finding and

9   recommendation adopted by 2014 WL 3615801 (E.D. Cal. July 22, 2014) (granting defendants'

10  motion for summary judgment on plaintiff's Eighth Amendment claim challenging abrupt

11  discontinuance of Tramadol and four-day taper of Gabapentin, with the use of an alternative

12  prescription for ibuprofen); Solomon v. Negrete, No. 2:10-cv-2103 WBS AC P, 2014 WL 546367

13  (E.D. Cal. Feb. 11, 2014), finding and recommendation adopted by 2014 WL 1024567 (E.D. Cal.

14  Mar. 14, 2014). (granting defendant's motion for summary judgment on plaintiff's Eighth

15  Amendment claim challenging the discontinuance of a morphine prescription, then tapering of

16  Tramadol and Gabapentin over one-week period, with the use of an alternate prescription for

17  ibuprofen); Fischer v. Algers, No. 2:12-cv2595 MCE CKD P, 2014 WL 3385184 (E.D. Cal. July

18  10, 2014) (recommending the granting of defendants' motion for summary judgment on

19  plaintiff's Eighth Amendment claim challenging his taper by prison medical staff from morphine,

20  to Tylenol 3 with codeine, to ibuprofen).

21          Here, in the absence of evidence that defendant Dr. Tseng's challenged conduct reflected

22  a medically unacceptable course of treatment, plaintiff's assertion that ibuprofen is ineffective in

23  treating his pain does not preclude the granting of summary judgment in defendant's favor.  As

24  the Magistrate Judge found in Montiel:

25          Although the parties appear to disagree as to whether Plaintiff's
           subjective complaints of pain were supported, this dispute does not
26          create a triable issue of fact in the face of Defendant['s] . . .
           uncontroverted evidence that in her opinion, discontinuing
27          gabapentin and tramadol in favor of NSAIDs was a medically
           appropriate course of treatment.  Defendant['s] [] description, made
28          within the context of evaluating Plaintiff from a medical standpoint,

                                                31

1          is entitled to deference in the absence of any evidence refuting it.
           Fed. R. Civ. P. 56(d)(4); Fed. R. Evid. 702.

2

3    2014 WL 2574533 at *8.

4          For all of the reasons set forth above, the undersigned finds no material issue of fact in

5    dispute precluding the granting of summary judgment.  Based upon the undisputed medical

6    evidence presented, the undersigned finds that defendant Dr. Tseng is entitled to summary

7    judgment in his favor on each of plaintiff's Eighth Amendment deliberate indifference claims.[25]

8                                        **CONCLUSION**

9          For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

10         1.  Defendant's motion for summary judgment (ECF No. 29) be granted; and

11         2.  Judgment be entered for defendant Dr. Tseng.

12         These findings and recommendations are submitted to the United States District Judge

13   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14   after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.  Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

17   objections shall be filed and served within seven days after service of the objections.  The parties

18   are advised that failure to file objections within the specified time may waive the right to appeal

19   the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20   Dated:  August 12, 2014

21

22                                      _Dale A. Drozd_
                                        _____
                                        DALE A. DROZD
23                                      UNITED STATES MAGISTRATE JUDGE

24   DAD: 4
     elli3118.msj

25

26

---

27   [25]  Where, as here, the alleged facts, viewed in the light most favorable to plaintiff, do not sustain
     a constitutional claim, the court need not reach defendant's alternative qualified immunity
28   defense.  Saucier v. Katz, 533 U.S. 194, 201 (2001).